UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

REHABILITATION SUPPORT
SERVICES, INC.,

                Plaintiff,

   -against-                                       1:14-CV-0499 (LEK/DJS)

CITY OF ALBANY, NEW YORK,

                Defendant.

## **MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

Plaintiff Rehabilitation Support Services, Inc. ("RSS") commenced this action against Defendant City of Albany, alleging that the City's zoning ordinance as it applies to community residences violates the Federal Housing Act ("FHA"), as amended by the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq*., and Title II of the Americans with Disabilities Act ("ADA"), 24 U.S.C. § 12131 *et seq*. Dkt Nos. 1 ("Complaint"), 51 ("Amended Complaint"). Presently before the Court are RSS's motion for summary judgment and the City's cross-motion for summary judgment. Dkt. Nos. 55 ("Plaintiff's Motion"), 58 ("Defendant's Motion"); <u>see also</u> Dkt. Nos. 55-3 ("Plaintiff's Statement of Material Facts"), 55-10 ("Plaintiff's Memorandum"), 58-1 ("Defendant's Statement of Material Facts"),[1] 58-6 ("Defendant's Memorandum"), 60 ("Plaintiff's Responsive Statement of Material Fact"), 60-2

---

[1]  The City submitted its response to RSS's statement of material facts in the same document as the City's own statement of material facts. To avoid confusion, the Court will refer to the section of this document beginning on page five under the heading "Defendant's Response to Plaintiff's Statement of Facts" as Defendant's Responsive Statement of Material Facts.

("Plaintiff's Reply"), 65 ("Defendant's Reply"). For the following reasons, the Court grants the City's Motion and denies RSS's Motion.

## II. BACKGROUND

### A. Factual Background

RSS is a not-for-profit corporation that provides residential services throughout New York State for people with disabilities. Pl.'s SMF ¶¶ 1–2; Def.'s Responsive SMF ¶¶ 1–2. RSS claims that it intends to build two residences, each housing twelve persons, for people recovering from alcoholism or substance abuse at 292 Second Street, Albany, New York. Am. Compl. ¶ 1.[2] RSS's residents "have major life activities substantially limited by their disability. Those activities are in various areas of daily living such as cooking, cleaning, medication management, budgeting, maintaining personal hygiene and appearance, and socialization." Pl.'s SMF ¶ 6; Def.'s Responsive SMF ¶¶ 6.[3] The proposed residences would have "24/7 supervision [and] the residents there [would] take part in the activities of daily living like any of the other residents in the neighborhood." Compl. ¶ 10. The residents would also be required to remain drug and alcohol free. Id. ¶ 9.

---

[2] The Court recognizes that in its original Complaint, RSS indicated its intention to build one twenty-four person residence. Compl. ¶ 1. But the disagreement between the parties over the size of the proposed residence is irrelevant for purposes of deciding the pending motions. See Pl.'s SMF ¶ 4; Def.'s Responsive SMF ¶ 4.

[3] "A person is handicapped if he or she has a mental or physical impairment. 42 U.S.C. § 3602(h). It is well established that individuals recovering from drug or alcohol addiction are handicapped under the FHA." Oxford House, Inc. v. Town of Babylon, 819 F. Supp. 1179, 1182 (E.D.N.Y. 1993).

The site at 292 Second Street is located in the City's R-2A zone, which is a "One and Two-Family Residential District." Pl.'s SMF ¶¶ 7–8; Def.'s Responsive SMF ¶¶ 7–8. The Albany Zoning Code defines a community residence as

> A residence for a disabled population, sponsored by a charitable religious or social service agency, providing a homelike environment and/or supervision for the housing and care of no more than 14 disabled persons within a setting that is integrated within the community. It shall be established similar to a single-family residence with shared living area, kitchen and bathroom facilities.

Pl.'s SMF ¶ 9; Def.'s Responsive SMF ¶ 9. A person seeking to build a community residence in the R-2A zone must obtain a use variance because community residences are not permitted as of right or by special permit in that zone, and variances are required for uses considered to be inconsistent with an area's existing zoning scheme. Def.'s SMF ¶¶ 5–7; Pl.'s Responsive SMF ¶¶ 5–7. In the R-2A zone, single- and two-family dwellings and houses of worship are permitted as of right. Def.'s SMF ¶ 12; Pl.'s Responsive SMF ¶ 12. On the other hand, private schools, nursing homes, day-care centers, colleges or universities, dormitories, bed-and-breakfasts, charitable or religious organizations, and satellite dish antennas are permitted with a special use permit. Def.'s SMF ¶ 13; Pl.'s Responsive SMF ¶ 13. And, like community residences, apartment buildings and rooming houses require a use variance. Def.'s SMF ¶ 14; Pl.'s Responsive SMF ¶ 14. RSS states that its proposed facilities would be classified as community residences. Pl.'s SMF ¶ 10.

On April 2, 2014, the Albany Board of Zoning Appeals denied RSS's application for a use variance for the 292 Second Street site. Am. Compl. ¶ 22; Dkt. No. 55-2 ("Devita Affidavit") ¶ 11. To receive a use variance, an applicant must show "that applicable zoning regulations and

3

restrictions have caused unnecessary hardship." Def.'s SMF ¶ 8; Pl.'s Responsive SMF ¶ 8. Applicants can prove unnecessary hardship by demonstrating that they cannot obtain a reasonable return on their investment in the property, that their hardship is unique and not widespread in the neighborhood, that the variance, if granted, will not alter the character of the neighborhood, and that the hardship was not self-imposed. Def.'s SMF ¶ 8; Pl.'s Responsive SMF ¶ 8. In contrast, special use permits are granted on a case-by-case basis, and uses in this category are generally considered to be compatible with the existing zoning scheme. Dkt. No. 55-6 ("Glass Deposition") at 28:21–29:15. According to RSS, use variances are harder to obtain than special permits in the R-2A zone. Pl.'s SMF ¶ 13.[4] Use variances allow the City to "preserve and protect the character of the neighborhood and the health, safety, and welfare of the community." Def.'s SMF ¶ 9; Pl.'s Responsive SMF ¶ 9. There are currently four community residences in the R-2A zone. Def.'s SMF ¶ 10; Pl.'s Responsive SMF ¶ 10. The City recently adopted a new zoning ordinance that allows community residences housing fewer than eight people in all of its zoning districts. See City of Albany Zoning Ordinance § 375 (adopted as of June 1, 2017).

**B. Procedural History**

RSS initiated this lawsuit on April 30, 2014. Compl. The City moved to dismiss on July 11, 2014, Dkt. No. 11 ("Motion to Dismiss"), and the Court denied the motion on July 2, 2015, Rehab. Support Servs., Inc. v. City of Albany, No. 14-CV-499, 2015 WL 4067066, at *12 (N.D.N.Y. July 2, 2015). RSS filed its Amended Complaint on October 25, 2016. Am. Compl.

---

[4] The City disputes RSS's assertion that it is more onerous to obtain a use variance, arguing instead that the process to obtain a special use permit is merely "different" from that for a use variance. Def.'s Responsive SMF ¶ 13. But even if the Court assumes that it is in fact more onerous to obtain a use variance, RSS has still failed to show that the City's ordinance is facially discriminatory.

The Amended Complaint asserts that the City's Zoning Ordinance is facially discriminatory in violation of the FHA and ADA because it bars community residences from the R-2A zone unless their owners obtain use variances. Am. Compl. ¶ 23. On March 1, 2017, RSS moved for summary judgment, Pl.'s Mot., arguing that the City failed to provide any legitimate reasons for its facially discriminatory ordinance, Pl.'s Mem. at 5. The City filed a cross-motion for summary judgment on April 4, 2017, Def.'s Mot., arguing that the ordinance is facially neutral and that it has legitimate, nondiscriminatory reasons for requiring use variances for community residences in the R-2A zone, Def.'s Mem. at 4–9.

### III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV.    DISCUSSION**

    **A. Zoning Discrimination in Violation of the FHA and ADA**

"Both the [FHA] and the ADA prohibit governmental entities from implementing or enforcing housing policies in a discriminatory manner against persons with disabilities." Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003). Under the FHA, it is "unlawful '[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap.'" Id. (alteration in original) (quoting 42 U.S.C. § 3604(f)(1)). "Similarly, the ADA states 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.'" Id. (quoting 42 U.S.C. § 12132). These provisions in the FHA and ADA have been

6

interpreted to forbid zoning restrictions that discriminate based on disability. Id. at 574. Courts regularly treat FHA and ADA claims in this context as interchangeable. E.g., Get Back Up, Inc. v. City of Detroit, No. 11-CV-13909, 2013 WL 3305672, at *4 (E.D. Mich. July 1, 2013) (citing Forest City Daly Hous. Inc. v. Town of North Hempstead, 175 F.3d 144, 151 (2d Cir. 1999)), aff'd, 606 F. App'x 792 (6th Cir. 2015). There are three potential theories of liability under the FHA and ADA: disparate treatment or intentional discrimination, disparate impact, and failure to provide reasonable accommodations for the disabled. Tsombanidis, 352 F.3d at 573. Facial challenges to statutes under the FHA and ADA are generally evaluated under the rubric of intentional discrimination. Larkin v. Mich. Dep't of Soc. Sec. Servs., 89 F.3d 285, 289 (6th Cir. 1996).

A plaintiff establishes a prima facie case of disparate treatment "by showing that animus against the protected group 'was a significant factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995) (quoting United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1226 (2d Cir. 1987)). A plaintiff need only show "that a protected characteristic played a role in the defendant's decision to treat her differently." Cmty. Hous. Tr. v. Dep't of Consumer & Regulatory Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003). With respect to facially discriminatory ordinances, "[d]ifferential treatment on the face of an ordinance demonstrates an intent to discriminate; additional evidence of discriminatory animus is not required." Children's All. v. City of Bellevue, 950 F. Supp. 1491, 1495 (W.D. Wash. 1997) (citing Bangerter v. Orem City Corp., 46 F.3d 1491, 1500–01 (10th Cir. 1995)). However, "[f]or a facially discriminatory policy, 'a plaintiff makes out a prima facie case of

7

intentional discrimination under the [FHA] . . . by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment' compared to others who are *similarly situated*." Pickens v. S. Nev. Reg'l Hous. Auth., No. 15-CV-203, 2015 WL 6773718, at *2 (D. Nev. Nov. 4, 2015) (second alteration in original) (emphasis added) (quoting Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1050 (9th Cir. 2007)).

Facial discrimination cases are most appropriately analyzed under the framework established by the Supreme Court in Johnson Controls. City of Boise, 490 F.3d at 1049 (citing Int'l Union, United Auto. Aerospace & Agric. Implement Workers v. Johnson Controls, Inc., 499 U.S. 187, 200–01 (1991)). Under the Johnson Controls approach, the Court first asks whether the statute is facially discriminatory. Id. at 1050. If the plaintiff can make out a prima facie case of facial discrimination, the Court, applying heightened scrutiny, proceeds to analyze the government's justifications for the statute and asks whether the statute benefits the protected class or responds to legitimate safety concerns. Id.; see also Sierra v. City of N.Y., 552 F. Supp. 2d 428, 430 (S.D.N.Y. 2008) (applying heightened scrutiny to a facially discriminatory housing policy).[5]

---

[5] In its previous order in this case, the Court stated that facial challenges to the FHA are analyzed under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03, 807 (1973). Rehab. Support Servs., 2015 WL 4067066, at *9. The Court relied on Mitchell v. Shane, 350 F.3d 39 (2d Cir. 2003), which did not involve a facial challenge. Rehab. Support Servs., 2015 WL 4067066, at *9. As discussed above, the weight of authority suggests that courts do not rely on McDonnell Douglas in analyzing facial challenges. See Johnson v. State of New York, 49 F.3d 75, 78–79 (2d Cir. 1995) (noting that McDonnell Douglas is only needed "to assist the fact-finding process when the plaintiff is unable to present direct evidence of discrimination"). The Court recognizes that the law of the case doctrine generally compels a district court to follow previous rulings in the same case. United States v. Salvagno, No. 02-CR-51, 2006 WL 2546477, at *6 n.15 (N.D.N.Y. Aug. 28, 2006) (Kahn, J.). But the Court's suggestion that McDonnell Douglas is the appropriate framework was clearly incorrect, and so the Court can revise this ruling. Rosenberger v. N.Y. State Office of Temp. &

*1. Is the Ordinance Facially Discriminatory?*

According to RSS, "there is . . . little dispute that the challenged law here, which prohibits community residences for people with disabilities in a residential zone of the City of Albany, is facially discriminatory." Pl.'s Mem. at 5. The City responds that community residences are not in fact prohibited, since they can be built after obtaining a use variance. Def.'s Mem. at 1. The City also argues that community residences are not the only type of building that cannot be built in the R-2A zone without a use variance. Id. at 2. Community residences are treated the same as apartment buildings and rooming houses in the zoning ordinance. Albany City Zoning Ordinance § 375-64; Dkt. No. 58-2 ("Glass Affidavit") ¶ 20. Apartment buildings are defined as containing four or more dwelling units, and rooming houses require three to twenty-five people to live in a single dwelling unit for a minimum of one week. Albany City Zoning Ordinance § 375-7.

RSS has failed to present evidence allowing a reasonable jury to find that the City's ordinance is facially discriminatory. That is because it has not offered any evidence to suggest that it is singled out or treated differently from similarly situated residences that are allowed as of right or need only a special permit in the R-2A zone. See Bangerter, 46 F.3d at 1501 (citing Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir.), aff'd in part Town of Huntington v. Huntington Branch, NAACP, 488 U.S. 15 (1988)); Larkin, 89 F.3d at 290 (discussing cases where no analysis of similarly situated groups was necessary because the ordinances singled out and applied only to a protected group). Moreover, there is no indication that the City's zoning ordinance imposes unique burdens on community residences.

---

Disability Assistance, No. 04-CV-475, 2004 WL 2996914, at *6 n.6 (N.D.N.Y. Dec. 20, 2004).

This case is on all fours with Get Back Up, 2013 WL 3305672. In Get Back Up, the plaintiff, Get Back Up ("GBU"), wanted to build a substance abuse treatment center in Detroit's "General Business District," known as the B-4 zone. Id. at 1. Both nursing homes and hospitals could be built as of right in the B-4 zone. Id. Residential uses, including fraternity and sorority houses, lofts, multiple-family dwellings, pre-release adjustment centers, rooming houses, single- and two-family homes, and substance abuse treatment centers could be built only if a conditional-use permit was obtained. Id. To obtain a conditional-use permit, an applicant was required to attend a public hearing and demonstrate that its proposed use satisfied fifteen permit criteria. Id. The Detroit Board of Zoning Appeals denied GBU's conditional-use permit application after two contentious hearings during which the public expressed vehement opposition to GBU building its residence in the B-4 district, which bordered a single-family residential zone. Id. at 2. Community members testified that GBU's proposed treatment center would jeopardize "their safety and the value of their property." Id. at 3. After its application was denied, GBU brought a lawsuit alleging that the city had violated the FHA, ADA, and Rehabilitation Act by "applying the ordinance to GBU in a discriminatory fashion." Id. at 4.

The court in Get Back Up stated that a zoning ordinance is discriminatory if it "places a burden *uniquely on the disabled*; singling them out is undoubtedly discriminatory . . . [but] it does not arise merely because an ordinance mentions a disabled group." Id. at 4 (emphasis added). The court then provided an example to illustrate this point. Id. at 5. The court imagined a "G-1 Golf District" with two "By-Right Uses:" (1) Golf courses and (2) Caddies' quarters, and four "Conditional Uses:" (1) Single-family home, (2) Multiple-family home, (3) Town house, and (4) Substance-abuse treatment center. Id. The court explained that this zoning arrangement

would not discriminate against recovering substance abusers because "they [were] placed with similar groups, and separated from dissimilar groups, based on a conventional, neutral distinction between recreational and non-recreational usage." Id.

The court concluded that GBU's substance-abuse treatment centers were materially different from nursing homes and hospitals. Id. at 5–6. GBU argued that the city treated it differently because of the patients it housed, but the court noted that GBU reached this conclusion by "ignoring or blurring the differences among a hospital, nursing home, and a substance-abuse treatment center." Id. at 5. GBU had claimed that if it "wanted to call itself a nursing home or a hospital, both of which entail continuing overnight stays (for weeks or months) with medical treatment, Get Back Up would have an absolute right to operate." Id. But, as the court pointed out, GBU's facilities were materially different from both hospitals and nursing homes: GBU proposed a residential use, which differed from a hospital where people do not plan to stay for long periods, and it provided medical care for people who could "physically attend themselves," unlike a nursing home, which provided care for people who need "constant physical assistance." Id. at 5–6.

Like the plaintiff in Get Back Up, RSS claims that the City's ordinance is facially discriminatory because it defines community residences as homes for the disabled and bars them from the R-2A zone unless they go through the allegedly onerous process of obtaining a use variance. But just as the plaintiff in Get Back Up failed to demonstrate that its substance-abuse treatment home was materially similar to a nursing home or hospital, RSS has not provided any evidence to show that community residences are materially similar to nursing homes, day-care centers, dormitories, bed-and-breakfasts, or any of the other uses allowed by special permit in the

11

R-2A zone. Nor has RSS offered evidence suggesting that community residences are similarly situated to as of right uses. In fact, unlike the plaintiff in Get Back Up, which claimed that it should be treated like nursing homes and hospitals because all three uses could be grouped together as providers of medical treatment, RSS has failed to provide any reasons why the Court should find community residences comparable to the uses allowed as of right or by special permit in the City's R-2A zone. Thus, RSS has not presented evidence that would allow a reasonable jury to find that the zoning ordinance it challenges is facially discriminatory. See id. at 7 ("Federal discrimination law typically ensures only that a disabled person is treated, when reasonably possible, like a person free of disability." (citing Forest City Daly Hous., 175 F.3d at 151–52)).

The Get Back Up Court also found that even if GBU housed people who had never consumed drugs or alcohol, it would still be required to obtain a conditional-use permit under the city's ordinance in the B-4 zone. Id. Similarly, here it appears that a residence for fourteen or fewer non-disabled people would be classified as a rooming house under the Albany City Zoning Code and would thus be subject to the same use variance application process that is required for a community residence. This further undermines RSS's attempt to show that the challenged ordinance is facially discriminatory.

RSS relies heavily on Human Resource Research & Mgmt. Grp., Inc. v. County of Suffolk to support its argument that the City's ordinance is facially discriminatory. 687 F. Supp. 2d 237 (E.D.N.Y. 2010). This reliance is misplaced, however, because the ordinance challenged in Human Resource Research imposed "restrictions and limitations solely upon a class of disabled individuals . . . that are generally not imposed on others seeking to live in Suffolk

County." Id. at 254. The plaintiffs in that case brought a facial challenge to a Suffolk County law regulating substance abuse recovery houses. Id. at 240. At issue were four provisions of the Suffolk County local law that imposed burdensome requirements on persons seeking to build a substance abuse recovery home. Id. at 257. The Suffolk County Legislature enacted the local law "in part to respond to community complaints about conditions in substance abuse houses, or sober homes," and the law applied only to substance abuse homes and the agencies sponsoring them. Id. at 243. Human Resource Research is unlike this case because Albany's R-2A zoning ordinance does not impose unique burdens on community residences, which are treated the same as apartment buildings and rooming houses.

RSS cites several other cases involving facial challenges to support its assertion that courts "on many occasions have stricken laws under the [FHA] that are facially discriminatory." Pl.'s Reply at 7–8. However, the majority of these cases involved regulations that uniquely burdened the disabled. See Larkin, 89 F.3d at 289–90 (finding distance limitations and neighborhood notification requirements that applied only to facilities housing the disabled to be facially discriminatory); Marbrunak, Inc. v. City of Stow, 974 F.2d 43, 47–48 (6th Cir. 1992) (declaring installation of "safety" equipment requirements applicable only to residences for the disabled to be facially discriminatory); Cmty. Hous. Tr., 257 F. Supp. 2d at 224 (finding an occupancy certificate requirement that applied only to the disabled to be facially discriminatory); United States v. City of Chicago Heights, 161 F. Supp. 2d 819, 843–45 (N.D. Ill. 2001) (finding provisions relating to occupancy, home size, sponsorship, and inspection that applied only to homes for the disabled to be facially discriminatory); Potomac Grp. Home Corp. v. Montgomery County, 823 F. Supp. 1285, 1289 (D. Md. 1993) (invalidating a facially discriminatory

neighborhood notification/public hearing requirement that was imposed only on residential facilities for the disabled); Horizon House Developmental Servs., Inc. v. Township of Upper Southampton, 804 F. Supp. 683, 693–94 (E.D. Pa. 1992) (declaring facially invalid a distance limitation that was applied only to homes for the handicapped), aff'd, 995 F.2d 217 (3d Cir. 1993).[6] But see Children's All., 950 F. Supp. at 1496–97 (invalidating a facially discriminatory ordinance that applied to youth homes and the disabled in a case primarily focused on familial status as a protected class under the FHA). Unlike the regulations at issue in these cases, the City's zoning ordinance does not impose unique burdens on RSS. Instead, those burdens are shared by rooming houses and apartment buildings. Thus, because RSS has failed to meet its initial burden of proving a prima facie case of intentional discrimination or disparate treatment, the Court must grant the City's cross-motion, and it need not evaluate the City's justifications for the ordinance.

## V.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the City's Cross-Motion for Summary Judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED**, that RSS's Motion for Summary Judgment (Dkt. No. 55) is **DENIED**; and it is further

---

[6] The court in Horizon House noted that "[i]t is irrelevant that the spacing requirement may incidentally catch within its net some unrelated groups of people without handicaps, such as juveniles or ex-criminal offenders, that live in supervised housing arrangements." 804 F. Supp. at 694. Unlike the City's R-2A zoning ordinance, the ordinance in Horizon House was "grounded in community opposition, stereotyping and prejudice against people with handicaps," and it was created explicitly to target "Horizon House homes and other housing for people with handicaps." Id. at 690.

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: July 28, 2017
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge